## SNIADACH *v.* FAMILY FINANCE CORP.
## OF BAY VIEW ET AL.

No. 130.   Argued April 21, 1969.—Decided June 9, 1969.

*Jack Greenberg* argued the cause for petitioner.   With him on the brief were *James M. Nabrit III, Thomas M. Jacobson,* and *William F. Young, Jr.*

*Sheldon D. Frank* argued the cause and filed a brief for respondents.

*Rhoda H. Karpatkin* and *Marvin M. Karpatkin* filed a brief for the Consumers Union of United States, Inc., as *amicus curiae* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondents instituted a garnishment action against petitioner as defendant and Miller Harris Instrument Co., her employer, as garnishee.   The complaint alleged

a claim of $420 on a promissory note. The garnishee filed its answer stating it had wages of $63.18 under its control earned by petitioner and unpaid, and that it would pay one-half to petitioner as a subsistence allowance[1] and hold the other half subject to the order of the court.

Petitioner moved that the garnishment proceedings be dismissed for failure to satisfy the due process requirements of the Fourteenth Amendment. The Wisconsin Supreme Court sustained the lower state court in approving the procedure. 37 Wis. 2d 163, 154 N. W. 2d 259. The case is here on a petition for a writ of certiorari. 393 U. S. 1078.

The Wisconsin statute gives a plaintiff 10 days in which to serve the summons and complaint on the defendant after service on the garnishee.[2] In this case petitioner was served the same day as the garnishee. She nonetheless claims that the Wisconsin garnishment procedure violates that due process required by the Fourteenth Amendment, in that notice and an opportunity to be heard are not given before the *in rem* seizure of the wages. What happens in Wisconsin is that the clerk of the court issues the summons at the request of the creditor's lawyer; and it is the latter who by serving the garnishee sets in motion the machinery whereby the

---

[1] Wis. Stat. § 267.18 (2) (a) provides:

"When wages or salary are the subject of garnishment action, the garnishee shall pay over to the principal defendant on the date when such wages or salary would normally be payable a subsistence allowance, out of the wages or salary then owing, in the sum of $25 in the case of an individual without dependents or $40 in the case of an individual with dependents; but in no event in excess of 50 per cent of the wages or salary owing. Said subsistence allowance shall be applied to the first wages or salary earned in the period subject to said garnishment action."

[2] Wis. Stat. § 267.07 (1).

wages are frozen.[3]  They may, it is true, be unfrozen if the trial of the main suit is ever had and the wage earner wins on the merits.  But in the interim the wage earner is deprived of his enjoyment of earned wages without any opportunity to be heard and to tender any defense he may have, whether it be fraud or otherwise.

Such summary procedure may well meet the requirements of due process in extraordinary situations.  Cf. *Fahey* v. *Mallonee,* 332 U. S. 245, 253–254; *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S. 594, 598–600; *Ownbey* v. *Morgan,* 256 U. S. 94, 110–112; *Coffin Bros.* v. *Bennett,* 277 U. S. 29, 31.  But in the present case no situation requiring special protection to a state or creditor interest is presented by the facts; nor is the Wisconsin statute narrowly drawn to meet any such unusual condition.  Petitioner was a resident of this Wisconsin community and *in personam* jurisdiction was readily obtainable.

The question is not whether the Wisconsin law is a wise law or unwise law.  Our concern is not what philosophy Wisconsin should or should not embrace.  See *Green* v. *Frazier,* 253 U. S. 233.  We do not sit as a super-legislative body.  In this case the sole question is whether there has been a taking of property without that procedural due process that is required by the Fourteenth Amendment.  We have dealt over and over again with the question of what constitutes "the right to be heard" (*Schroeder* v. *New York,* 371 U. S. 208, 212) within the meaning of procedural due process.  See *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306, 314.  In the latter case we said that the right to be heard "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether

---

[3] Wis. Stat. § 267.04 (1).

to appear or default, acquiesce or contest." 339 U. S., at 314. In the context of this case the question is whether the interim freezing of the wages without a chance to be heard violates procedural due process.

A procedural rule that may satisfy due process for attachments in general, see *McKay* v. *McInnes*, 279 U. S. 820, does not necessarily satisfy procedural due process in every case. The fact that a procedure would pass muster under a feudal regime does not mean it gives necessary protection to all property in its modern forms. We deal here with wages—a specialized type of property presenting distinct problems in our economic system. We turn then to the nature of that property and problems of procedural due process.

A prejudgment garnishment of the Wisconsin type is a taking which may impose tremendous hardship on wage earners with families to support. Until a recent Act of Congress,[4] § 304 of which forbids discharge of employees on the ground that their wages have been garnished, garnishment often meant the loss of a job. Over and beyond that was the great drain on family income. As stated by Congressman Reuss:[5]

> "The idea of wage garnishment in advance of judgment, of trustee process, of wage attachment, or whatever it is called is a most inhuman doctrine. It compels the wage earner, trying to keep his family together, to be driven below the poverty level."

Recent investigations of the problem have disclosed the grave injustices made possible by prejudgment garnishment whereby the sole opportunity to be heard comes after the taking. Congressman Sullivan, Chairman of

---

[4] 82 Stat. 146, Act of May 29, 1968.

[5] 114 Cong. Rec. 1832.

the House Subcommittee on Consumer Affairs who held extensive hearings on this and related problems stated:

"What we know from our study of this problem is that in a vast number of cases the debt is a fraudulent one, saddled on a poor ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up his pound of flesh, and being fired besides."   114 Cong. Rec. 1832.

The leverage of the creditor on the wage earner is enormous.   The creditor tenders not only the original debt but the "collection fees" incurred by his attorneys in the garnishment proceedings:

"The debtor whose wages are tied up by a writ of garnishment, and who is usually in need of money, is in no position to resist demands for collection fees. If the debt is small, the debtor will be under considerable pressure to pay the debt and collection charges in order to get his wages back.   If the debt is large, he will often sign a new contract of 'payment schedule' which incorporates these additional charges." [6]

Apart from those collateral consequences, it appears that in Wisconsin the statutory exemption granted the wage earner [7] is "generally insufficient to support the debtor for any one week." [8]

The result is that a prejudgment garnishment of the Wisconsin type may as a practical matter drive a wage-

---

[6] Comment, Wage Garnishment in Washington—An Empirical Study, 43 Wash. L. Rev. 743, 753 (1968).   And see Comment, Wage Garnishment as a Collection Device, 1967 Wis. L. Rev. 759.

[7] See n. 1, *supra*.

[8] Comment, Wage Garnishment as a Collection Device, 1967 Wis. L. Rev. 759, 767.

earning family to the wall.[9]   Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing (cf. *Coe v. Armour Fertilizer Works,* 237 U. S. 413, 423) this prejudgment garnishment procedure violates the fundamental principles of due process.

*Reversed.*

MR. JUSTICE HARLAN, concurring.

Particularly in light of my Brother BLACK's dissent, I think it not amiss for me to make explicit the precise basis on which I join the Court's opinion.   The "property" of which petitioner has been deprived is the *use* of the garnished portion of her wages during the interim period between the garnishment and the culmination of the main suit.   Since this deprivation cannot be characterized as *de minimis,* she must be accorded the usual requisites of procedural due process: notice and a prior hearing.

The rejoinder which this statement of position has drawn from my Brother BLACK prompts an additional word.   His and my divergence in this case rests, I think, upon a basic difference over whether the Due Process Clause of the Fourteenth Amendment limits state action by norms of "fundamental fairness" whose content in any given instance is to be judicially derived not alone, as my colleague believes it should be, from the specifics of the Constitution, but also, as I believe, from concepts

---

[9] "For a poor man—and whoever heard of the wage of the affluent being attached?—to lose part of his salary often means his family will go without the essentials.   No man sits by while his family goes hungry or without heat.   He either files for consumer bankruptcy and tries to begin again, or just quits his job and goes on relief.   Where is the equity, the common sense, in such a process?"   Congressman Gonzales, 114 Cong. Rec. 1833.   For the impact of garnishment on personal bankruptcies see H. R. Rep. No. 1040, 90th Cong., 1st Sess., 20–21.

which are part of the Anglo-American legal heritage—
not, as my Brother BLACK continues to insist, from the
mere predilections of individual judges.

From my standpoint, I do not consider that the require-
ments of "notice" and "hearing" are satisfied by the
fact that the petitioner was advised of the garnishment
simultaneously with the garnishee, or by the fact that
she will not permanently lose the garnished property
until after a plenary adverse adjudication of the under-
lying claim against her, or by the fact that relief from
the garnishment may have been available in the interim
under less than clear circumstances. Compare the ma-
jority and dissenting opinions in the Wisconsin Supreme
Court, 37 Wis. 2d 163, 178, 154 N. W. 2d 259, 267 (1967).
Apart from special situations, some of which are referred
to in this Court's opinion, see *ante,* at 339, I think that
due process is afforded only by the kinds of "notice" and
"hearing" which are aimed at establishing the validity,
or at least the probable validity, of the underlying claim
against the alleged debtor *before* he can be deprived of
his property or its unrestricted use. I think this is the
thrust of the past cases in this Court. See, *e. g., Mullane*
v. *Central Hanover Trust Co.,* 339 U. S. 306, 313 (1950);
*Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 152–
153 (1941); *United States* v. *Illinois Cent. R. Co.,* 291
U. S. 457, 463 (1934); *Londoner* v. *City & County of
Denver,* 210 U. S. 373, 385–386 (1908).* And I am

---

*There are other decisions to the effect that one may be deprived
of property by summary administrative action taken before hearing
when such action is essential to protect a vital governmental
interest. See, *e. g., Ewing* v. *Mytinger & Casselberry, Inc.,* 339
U. S. 594 (1950); *Fahey* v. *Mallonee,* 332 U. S. 245 (1947); *Bowles*
v. *Willingham,* 321 U. S. 503 (1944); *North Amer. Cold Storage Co.*
v. *City of Chicago,* 211 U. S. 306 (1908). However, no such
justification has been advanced in behalf of Wisconsin's garnishment
law.

quite unwilling to take the unexplicated *per curiam* in *McKay* v. *McInnes,* 279 U. S. 820 (1929), as vitiating or diluting these essential elements of due process.

MR. JUSTICE BLACK, dissenting.

The Court here holds unconstitutional a Wisconsin statute permitting garnishment before a judgment has been obtained against the principal debtor. The law, however, requires that notice be given to the principal debtor and authorizes him to present all of his legal defenses at the regular hearing and trial of the case. The Wisconsin law is said to violate the "fundamental principles of due process." Of course the Due Process Clause of the Fourteenth Amendment contains no words that indicate that this Court has power to play so fast and loose with state laws. The arguments the Court makes to reach what I consider to be its unconstitutional conclusion, however, show why it strikes down this state law. It is because it considers a garnishment law of this kind to be bad state policy, a judgment I think the state legislature, not this Court, has power to make. The Court shows it believes the garnishment policy to be a " 'most inhuman doctrine' "; that it " 'compels the wage earner, trying to keep his family together, to be driven below the poverty level' "; that " 'in a vast number of cases the debt is a fraudulent one, saddled on a poor ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up his pound of flesh, and being fired besides.' "

The foregoing emotional rhetoric might be very appropriate for Congressmen to make against some phases of garnishment laws. Indeed, the quoted statements were made by Congressmen during a debate over a proposed

federal garnishment law. The arguments would also be appropriate for Wisconsin's legislators to make against that State's garnishment laws. But made in a Court opinion, holding Wisconsin's law unconstitutional, they amount to what I believe to be a plain, judicial usurpation of state legislative power to decide what the State's laws shall be. There is not one word in our Federal Constitution or in any of its Amendments and not a word in the reports of that document's passage from which one can draw the slightest inference that we have authority thus to try to supplement or strike down the State's selection of its own policies. The Wisconsin law is simply nullified by this Court as though the Court had been granted a super-legislative power to step in and frustrate policies of States adopted by their own elected legislatures. The Court thus steps back into the due process philosophy which brought on President Roosevelt's Court fight. Arguments can be made for outlawing loan sharks and installment sales companies but such decisions, I think, should be made by state and federal legislators, and not by this Court.

This brings me to the short concurring opinion of my Brother HARLAN, which makes "explicit the precise basis" on which he joins the Court's opinion. That basis is:

> "The 'property' of which petitioner has been deprived is the *use* of the garnished portion of her wages during the interim period between the garnishment and the culmination of the main suit. Since this deprivation cannot be characterized as *de minimis,* she must be accorded the usual requisites of procedural due process: notice and a prior hearing."

Every argument implicit in this summary statement of my Brother HARLAN's views has been, in my judgment, satisfactorily answered in the opinion of the Supreme Court of Wisconsin in this case—an outstanding opinion

on constitutional law. 37 Wis. 2d 163, 154 N. W. 2d 259. That opinion shows that petitioner was not required to wait until the "culmination of the main suit," that is, the suit between the creditor and the petitioner. In fact the case now before us was not a final determination of the merits of that controversy but was, in accordance with well-established state court procedure, the result of a motion made by the petitioner to dismiss the garnishment proceedings. With reference to my Brother HARLAN's statement that petitioner's deprivation could not be characterized as *de minimis,* it is pertinent to note that the garnishment was served on her and her employer on the same day, November 21, 1966; that she, without waiting for a trial on the merits, filed a motion to dismiss the garnishment on December 23, 1966, which motion was denied by the Circuit Court on April 18, 1967; and that it is that judgment which is before us today. The amount of her wages held up by the garnishment was $31.59. The amount of interest on the wages withheld even if computed at 10% annually would have been about $3. Whether that would be classified as *de minimis* I do not know and in fact it is not material to know for the decision of this case.

In the motion to dismiss, petitioner, according to the Supreme Court of Wisconsin, asserted a "number of grounds based on injustices and deprivations which have been, or are likely to be, suffered by others, but which she has not personally experienced." 37 Wis. 2d 163, 166, 154 N. W. 2d 259, 261. The court went further and pointed out that under Wisconsin law the court would not strike down a law as unconstitutional on the ground that some person other than the challenger of that law might in the future be injured by its unconstitutional part. It would seem, therefore, that the great number of our cases holding that we do not determine the consti-

tutionality of state statutes where the judgment on them was based on state law would prevent our passing on this case at all.

The indebtedness of petitioner was evidenced by a promissory note, but petitioner's affidavit in support of the motion to dismiss, according to the Wisconsin Supreme Court contained no allegation that she is not indebted thereon to the plaintiff. Of course if it had alleged that, or if it had shown in some other way that this was not a good-faith lawsuit against her, the Wisconsin opinion shows that this could have disposed of the whole case on the summary motion.

Another ground of unconstitutionality, according to the state court, was that the Act permitted a defendant to post a bond and secure the release of garnished property and that this provision denied equal protection of the law "to persons of low income." With reference to this ground, the Wisconsin court said:

> "Appellant has made no showing that she is a person of low income and unable to post a bond." 37 Wis. 2d, at 167, 154 N. W. 2d, at 261.

Another ground of unconstitutionality urged was that since many employers discharge garnished employees for being unreliable, the law threatened the gainful employment of many wage earners. This contention the Supreme Court of Wisconsin satisfactorily answered by saying that petitioner had "made no showing that her own employer reacted in this manner."

Another ground challenging the state act was that it affords 10 days' time to a plaintiff to serve the garnishee summons and complaint on the defendant after service of the summons on the garnishee. This, of course, she could not raise. The Wisconsin Supreme Court's answer to this was that petitioner was served on the same day as the garnishee.

The state court then pointed out that the garnishment proceedings did not involve "any final determination of the title to a defendant's property, but merely preserve[d] the status quo thereof pending determination of the principal action." 37 Wis. 2d, at 169, 154 N. W. 2d, at 262. The court then relied on *McInnes* v. *McKay,* 127 Me. 110, 141 A. 699. That suit related to a Maine attachment law which, of course, is governed by the same rule as garnishment law. See "garnishment," Bouvier's Law Dictionary; see also *Pennoyer* v. *Neff,* 95 U. S.. 714. The Maine law was subjected to practically the same challenges that Brother HARLAN and the Court raise against this Wisconsin law. About that law the Supreme Court of Maine said:

> "But, although an attachment may, within the broad meaning of the preceding definition, deprive one of property, yet conditional and temporary as it is, and part of the legal remedy and procedure by which the property of a debtor may be taken in satisfaction of the debt, if judgment be recovered, we do not think it is the deprivation of property contemplated by the Constitution. And if it be, it is not a deprivation without 'due process of law' for it is a part of a process, which during its proceeding gives notice and opportunity for hearing and judgment of some judicial or other authorized tribunal. The requirements of 'due process of law' and 'law of the land' are satisfied." 127 Me. 110, 116, 141 A. 699, 702–703.

This Court did not even consider the challenge to the Maine law worthy of a Court opinion but affirmed it in a *per curiam* opinion, 279 U. S. 820, on the authority of two prior decisions of this Court. See also *Standard Oil Co.* v. *Superior Court of New Castle County,* 44 Del.

538, 62 A. 2d 454, appeal dismissed, 336 U. S. 930; *Harris* v. *Balk,* 198 U. S. 215, 222, 227–228.

The Supreme Court of Wisconsin, in upholding the constitutionality of its law also cited the following statement of our Court made in *Rothschild* v. *Knight,* 184 U. S. 334, 341:

> "To what actions the remedy of attachment may be given is for the legislature of a State to determine and its courts to decide . . . ."

Accord, *Huron Holding Corp.* v. *Lincoln Mine Operating Co.,* 312 U. S. 183, 193.

The Supreme Court of Wisconsin properly pointed out:

> "The ability to place a lien upon a man's property, such as to temporarily deprive him of its beneficial use, without any judicial determination of probable cause dates back not only to medieval England but also to Roman times." 37 Wis. 2d, at 171, 154 N. W. 2d, at 264.

The State Supreme Court then went on to point out a statement made by Mr. Justice Holmes in *Jackman* v. *Rosenbaum Co.,* 260 U. S. 22, 31:

> "The Fourteenth Amendment, itself a historical product, did not destroy history for the States and substitute mechanical compartments of law all exactly alike. If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it, as is well illustrated by *Ownbey* v. *Morgan,* 256 U. S. 94, 104, 112."

The *Ownbey* case, which was one of the two cited by this Court in its *per curiam* affirmance of *McInnes* v. *McKay, supra,* sustained the constitutionality of a Delaware attachment law. And see *Byrd* v. *Rector,* 112 W. Va. 192, 163 S. E. 845.

I can only conclude that the Court is today overruling a number of its own decisions and abandoning the legal customs and practices in this country with reference to attachments and garnishments wholly on the ground that the garnishment laws of this kind are based on unwise policies of government which might some time in the future do injury to some individuals. In the first sentence of the argument in her brief, petitioner urges that this Wisconsin law "is contrary to public policy"; the Court apparently finds that a sufficient basis for holding it unconstitutional. This holding savors too much of the "Natural Law," "Due Process," "Shock-the-conscience" test of what is constitutional for me to agree to the decision. See my dissent in *Adamson* v. *California,* 332 U. S. 46, 68.

## ADDENDUM.

The latest statement by my Brother HARLAN on the power of this Court under the Due Process Clause to hold laws unconstitutional on the ground of the Justices' view of "fundamental fairness" makes it necessary for me to add a few words in order that the differences between us be made absolutely clear. He now says that the Court's idea of "fundamental fairness" is derived "not alone . . . from the specifics of the Constitution, but also . . . from concepts which are part of the Anglo-American legal heritage." This view is consistent with that expressed by Mr. Justice Frankfurter in *Rochin* v. *California* that due process was to be determined by "those canons of decency and fairness which express the notions of justice of English-speaking peoples. . . ." 342 U. S. 165, 169. In any event, my Brother HARLAN's "Anglo-American legal heritage" is no more definite than the "notions of justice of English-speaking peoples" or the shock-the-conscience test. All of these so-called tests represent nothing more or less than an implicit adop-

tion of a Natural Law concept which under our system leaves to judges alone the power to decide what the Natural Law means. These so-called standards do not bind judges within any boundaries that can be precisely marked or defined by words for holding laws unconstitutional. On the contrary, these tests leave them wholly free to decide what they are convinced is right and fair. If the judges, in deciding whether laws are constitutional, are to be left only to the admonitions of their own consciences, why was it that the Founders gave us a written Constitution at all?