UNITED STATES of America, Plaintiff,

v.

KAIYO MARU NUMBER 53, with its fishing gear, furniture, appurtenances, stores, fish and cargo, Defendant.

KAIYO GYOGYO COMPANY, LTD., Claimant and Third Party Plaintiff,

v.

Juanita KREPPS, Secretary of Commerce, and United States Department of Commerce, Third Party Defendants.

Civ. No. A 79–160.

United States District Court, D. Alaska.

Dec. 8, 1980.

Dan E. Dennis, Asst. U. S. Atty., Anchorage, Alaska, for plaintiff.

John H. Bradbury, Bradbury, Bliss, & Riordon, Anchorage, Alaska, for defendant and claimant.

FITZGERALD, District Judge.

The KAIYO MARU NO. 53, a Japanese hokuten trawler, was detained and searched on June 2, 1979, by the Coast Guard Cutter STORIS 22 miles southeast of Kiska Island in the Aleutians. The KAIYO was authorized to fish within the Fishery Conservation Zone of the North Pacific under a permit issued by the National Oceanic and Atmospheric Administration acting within authority delegated by the Fishery Conservation and Management Act of 1976.[1] The STORIS first observed the KAIYO fishing in area 54 of the zone rather than in area 52 for which she had been cleared according to Coast Guard records.

Since the KAIYO was required by provisions of the Act, with its implementing regulations, to maintain certain logs and documents, the captain of the STORIS ordered a boarding party to the KAIYO so that her records could be examined. The captain also ordered the boarding party to inspect the vessel's catch. Search in the vessel's holds revealed substantial overlogging and mislogging of the catch. In addition, the search revealed possession of hali-but, a species prohibited to foreign fishing under the Act.

The boarding officer promptly recommended that the KAIYO be seized for violations of the Act. His recommendation was approved by the captain of the STORIS and forwarded to the Commander, Seventeenth Coast Guard District 17. After consultation with the Regional Director of the National Marine Fisheries, the Commander, Seventeenth Coast Guard District 17 endorsed the recommendation for seizure and forwarded a request to the Commandant of the United States Coast Guard in Washington, D.C. There the request was jointly approved by the Commandant, United States Coast Guard, and by authorized officers of the State Department. The captain of the STORIS, upon receiving approval, ordered the KAIYO to proceed to the port of Kodiak, Alaska, where her catch was unloaded and inventoried. The inventory confirmed mislogging and underlogging of the catch as well as 11½ tons of partially processed immature halibut.

On June 12, 1979, the United States instituted forfeiture proceedings against the KAIYO for alleged violations of sections 1821 and 1857 of the Act. Following a court hearing, the catch was ordered sold by the United States Marshal, and the vessel was released on bond July 9, 1979 to fish in the Fishery Conservation Zone pending the outcome of forfeiture proceedings. Shortly after returning to the fishing grounds, the KAIYO's permit to fish was revoked and the vessel returned to her home port of Hachinoke, Japan.[2]

Following the evidentiary hearing on the forfeiture proceedings on May 14, 1980, I entered Findings of Fact on the record, and concluded that the KAIYO had committed acts prohibited by the Act. However, several issues remained concerning the scope

---

1. 16 U.S.C. §§ 1801–1882 (1978) [hereinafter cited as FCMA].

2. On motion by defendant and claimant that such revocation was illegal, I held as a matter of statutory interpretation that under the FCMA Congress intended that a permit sanction be imposed only after a hearing had been held to determine whether the vessel was in fact used in the commission of an act prohibited by the FCMA. That decision is incorporated as part of this opinion. See text accompanying notes 33–49, infra. The permit of the KAIYO MARU was returned and the vessel resumed fishing pending these proceedings.

and validity of enforcement procedures under the Act.[3] Specifically, the claimant contended (a) that the boarding and search of the vessel by the Coast Guard constitutes a violation of the Fourth Amendment; (b) that the Act discriminates against aliens as a class thus violating the Fifth Amendment; (c) that the Act fails to establish standards and guidelines for imposing sanctions and allows the Coast Guard undue discretion thereby violating the due process requirements of the Fifth Amendment; (d) that the arrest of the vessel pursuant to the Act and Admiralty Rule C was unconstitutional in that it involved an unreasonable search and seizure in violation of the Fourth Amendment; and (e) amounted to deprivation of property without notice in violation of the Fifth Amendment. Finally, the claimant urges that following a judgment of forfeiture the court need not order forfeiture of the complete vessel or its full value but may instead order a partial forfeiture. It is those issues which are now addressed.

## THE FISHERY CONSERVATION AND MANAGEMENT ACT

After extensive and prolonged debate, Congress enacted the Fishery Conservation and Management Act of 1976[4] extending federal fishery management jurisdiction to 200 nautical miles. The Act established comprehensive management of United States fisheries for the first time, and was the culmination of efforts dating back to the Truman Proclamations of 1945.[5]

The Truman Proclamations unilaterally established federal jurisdiction over the continental shelf and created a fisheries conservation zone of unspecified extent.[6] The most important one,[7] *Policy of the United States with Respect to Coastal Fisheries in Certain Areas of the High Seas*, established several principles: (1) that the United States may establish conservation zones on the high seas for the purpose of protecting its coastal fisheries from overfishing; (2) that where only American fishermen are concerned, the United States may do this unilaterally; where fishermen of other nations are also concerned, the United States may do this in conjunction with such other nations; and (3) that the United States recognizes the right of other nations to take similar steps to protect their coastal fisheries.[8]

Earlier efforts had sought a solution to high seas fisheries management by way of international agreements and cooperation. Unfortunately, not a great deal was accomplished; in the 1958 and 1960 United Nations Conferences on the Law of the Sea, participants were unable to reach consensus on the possible limits of fishery jurisdiction. In 1966 the United States unilaterally established a fisheries zone of nine miles contiguous to the three-mile territorial sea.[9] Within that zone the United States assumed exclusive jurisdiction permitting however, certain traditional fishing by foreign states to the extent recognized by the United States.

Federal management of fishery resources within the zone adjacent to the territorial sea proved to be haphazard due to weak and divided authority and inadequate en-

3. This opinion contains additional findings of fact and the conclusions of law and rulings on all legal issues. *See* F.R.C.P. 52(a).

4. Pub.L.No.94–265, 90 Stat. 331.

5. *See generally*, Magnuson, *The Fishery Conservation and Management Act of 1976: First Step Toward Improved Management* of Marine Fisheries, 52 Wash.L.Rev. 427 (1977) [hereinafter cited as Magnuson].

6. *See* Proclamation No. 2667, 3 C.F.R. 67 (1943–1948 compilation); Proclamation No. 2668, 3 C.F.R. 68 (1943–1948 compilation).

7. Proclamation No. 2668, 3 C.F.R. 68 (1943–1948 compilation).

8. The proclamation was seen as a narrow statement intended to encourage joint negotiations with other countries in the conservation of fishery resources. It was not intended as an extension of sovereignty over areas of the high seas.

9. Bartlett Act, Pub.L.No.89–658, 80 Stat. 908 (1966).

forcement.[10] The states, relying on authority conferred by the Submerged Lands Act of 1953,[11] appeared to be the only government units capable of exercising comprehensive fishery management authority.[12]

Pressure from increases in foreign fishing in the coastal waters of the United States, coupled with the realization that the law of the sea negotiations would be unable to provide comprehensive solutions to fishery conservation in the immediate future, directly led to enactment of the Fishery Conservation Management Act of 1976.[13]

The Act purports to accomplish two broad objectives. It extends the jurisdiction of the United States to the newly created fishery conservation zone which adjoins the three-mile territorial sea and extends seaward 200 nautical miles from the coast, permitting broader regulation of marine fishery resources. Additionally, the Act imposes management regions within the conservation zone thereby providing a comprehensive scheme of management, planning, regulation and enforcement.

There are four titles in the Act. Title I declares the authority of the United States over fishery management and establishes the Fishery Conservation Zone.[14] Within the zone the United States undertakes to exercise exclusive fishery management authority over all fish [15] with the exception of "highly migratory species." [16] Federal jurisdiction is asserted as well over anadromous species that spawn in United States waters [17] and sedentary species found on the continental shelf beyond the zone.[18]

Title II provides for and regulates foreign fishing within the zone. It authorizes foreign fishing if either (1) a treaty or international fishery agreement exists or (2) the foreign nation enters into a governing international fishery agreement with the United States.[19] In that event, each foreign vessel is to be issued an annual permit by the Secretary of State upon concurrence by the Secretary of Commerce.[20] License fees may be charged for foreign vessel permits [21] and permits may be suspended or revoked for violation of the Act.[22] Foreign fishermen are limited in their catch to an allocation determined by the Regional Fishery Management Councils established under Title III.[23]

Title III authorizes and requires these management councils: (1) to develop and amend fishery management plans; (2) to submit periodic reports to the Secretary of Commerce; (3) to review and revise assessments of optimum yield and fishing allowances to foreign licenses; (4) to encourage public participation, through hearings, in the development of fishery management plans and the administration of the Act; (5) to establish scientific and statistical committees and advisory panels; and (6) to undertake other activities necessary for carrying out the Act.[24] This title also provides the requirements of fishery management plans,[25] and the procedure by which such plans are to be developed and implemented.[26] Civil and criminal penalties are

10. Magnuson, *supra* note 5, at 432.

11. 43 U.S.C. § 1311 (1970).

12. Magnuson, *supra* note 5, at 432.

13. Thirty-six bills were introduced in the 94th Congress for the purpose of conserving and managing fishery resources. The FCMA emerged as an amalgam of several approaches suggested by the various bills.

14. 16 U.S.C. § 1811 (1978).

15. 16 U.S.C. § 1812.

16. 16 U.S.C. § 1813.

17. 16 U.S.C. § 1812(2).

18. 16 U.S.C. § 1812(3).

19. 16 U.S.C. § 1821(b) and (c).

20. 16 U.S.C. § 1821(a).

21. 16 U.S.C. § 1824(b)(10).

22. 16 U.S.C. § 1824(b)(12).

23. 16 U.S.C. § 1853(a)(3).

24. 16 U.S.C. § 1852(g)–(h).

25. 16 U.S.C. § 1853.

26. 16 U.S.C. §§ 1854–1855.

provided for, including forfeiture of vessel, gear and catch.[27]

Title IV of the Act undertakes to provide necessary authority to revise the regulations to conform to any agreement that may be reached as a result of the Third Law of the Sea Conference,[28] thereby making the Act an interim measure should a comprehensive international agreement be reached. Finally, inconsistent provisions of other legislation are amended to conform to the intent of the Act.[29]

### 1. Management of Fishery Resources

Regional Fishery Management Councils are required under the Act to prepare and submit to the Secretary of Commerce a management plan for each fishery.[30] The council management plan must provide for an optimum annual yield of each species of fish after taking into consideration several factors. American fishermen are preferred in allocations of annual yields of the several species. Accordingly, foreign fishermen are permitted to take only that portion of the optimum yield not utilized by the American fishermen. That part of the optimum yield allowed foreign fishermen is in turn allocated by the state department among the foreign nations. Finally, each foreign nation allocates its share among the owners or operators of vessels in its fishing fleet. Applications from the owners or operators of foreign fishing vessels are submitted to the Secretary of Commerce for a permit authorizing that vessel to enter the fishery conservation zone to fish for a quota of each species.

For management purposes the fishery conservation zone has been divided into a number of fishing areas. In order to insure that the optimum for each species is not exceeded and sufficient stocks are perpetuated, a comprehensive reporting system has been devised. Every vessel fishing within a specified fishing area in the zone must keep a daily cumulative catch log. A fishing vessel may transfer from one designated fishing area to another, but must give prior notice to the Coast Guard. That notice must be recorded in a communications log and in the vessel's log. Should the optimum yield of a species be harvested in a specified fishing area, that area is immediately closed to all fishing and vessels there must proceed into other areas in order to take their quotas.

Beyond the self-reporting requirements and records necessarily kept by every vessel fishing in the conservation zone, official observers of the National Marine Fishery are sometimes placed aboard processor vessels and larger fishing vessels to make ongoing estimates of the tonnage caught of the various species. Observer reports, along with daily cumulative reports from fishing vessels, as shown by their daily cumulative catch log, are recorded and analyzed in order to make the necessary regulatory decisions. Most of the data is self-reported. Thus, reliability in the self-reporting system is absolutely vital to fishery management under the Act.

### 2. Enforcement of the Act

The Coast Guard, in conjunction with the National Marine Fishery Agency, has been given the responsibility for enforcement of the Act and has adopted comprehensive patrol operation orders. Alaska Patrol Operation Order 201 (YR) for Coast Guard District 17 is a voluminous document dealing in detail with various aspects of the enforcement effort. In accordance with the order, Coast Guard units have been assigned to carry out many varied functions of the enforcement plan.

The Coast Guard Cutter STORIS is charged, among other things, with making

---

27. 16 U.S.C. §§ 1858–1860.

28. 16 U.S.C. § 1881.

29. The FCMA amends the Fishermen's Protective Act, the Marine Mammal Protection Act, and the Atlantic Tunas Convention Act.

30. 16 U.S.C. § 1852(7). The North Pacific Fishery Management Council consists of the states of Alaska, Washington, and Oregon and has authority over the fisheries in the Arctic Ocean, Bering Sea and Pacific Ocean, seaward of Alaska. 16 U.S.C. § 1826(7).

surface patrols to obtain information about the activities of fishing vessels.[31] On patrol the STORIS routinely detains foreign vessels for the purpose of examining the catch so as to determine whether the vessel is correctly maintaining its daily cumulative catch log and the other records required under the Act or its implementing regulations. According to the operations order, the STORIS may detain and board vessels for enforcement of treaties, the laws or Act, or as a courtesy extended by the boarded vessel. In general the order provides that most foreign vessels may be boarded. As a matter of right while in United States' territorial waters except in the case of innocent passage or *force majeure*. Foreign warships or government vessels operated for non-commercial purposes are generally exempt from boarding under international law. More definitively the order directs that within the fishery conservation zone all foreign vessels engaged in active fishing may be boarded, but if they are beyond the fishery conservation zone, they may be boarded only if over the continental shelf of the United States and fishing in a manner which would result in taking creatures of the shelf.[32] Examples of proper exercise of boarding jurisdiction are included as guidelines in the order. These examples disclose that unless the foreign vessel is actually engaged in fishing, a boarding is not authorized.

## THE PERMIT REVOCATION

Section 1824 of the Code provides for the suspension or revocation of the permit of any vessel which "has been used in the commission of any act prohibited by section 1857" of Title 16.[33] Suspension or revocation of a permit for the commission of such offenses is not mandatory but rests within the discretion of the Secretary of Commerce. A foreign vessel is prohibited from fishing in the zone without such a permit and is subject to criminal prosecution for unauthorized fishing.[34]

Acting under authority conferred by the Act,[35] the Secretary of Commerce has promulgated extensive implementing regulations.[36] Included are those relating to permit sanctions.[37] Prior notice of permit sanction is required,[38] and the owner or operator of a foreign vessel is allowed 30 calendar days from such notice before the sanction becomes effective.[39] Within this period, the owner or operator may request a hearing[40] and if requested, the effective date of the sanction is suspended until a hearing is held.[41] However, the regulations authorize the director of the National Marine Fisheries Service (or his designee) to

**31.** 3(C) of Operation Order 201 (YR).

**32.** *See* Operation Order 201 (YR) Tab. B to Appendix 1 to Annex D (p. 71). [hereinafter "Operation Order 201"].

**33.** 16 U.S.C. § 1824(b)(12). The full text of that section states:

    **(12) Sanctions.**—If any foreign fishing vessel for which a permit has been issued pursuant to this subsection has been used in the commission of any act prohibited by section 1857 of this title the Secretary may, or if any civil penalty imposed under section 1858 of this title or any criminal fine imposed under section 1859 of this title has not been paid and is overdue the Secretary shall—

    (A) revoke such permit, with or without prejudice to the right of the foreign nation involved to obtain a permit for such vessel in any subsequent year;

    (B) suspend such permit for the period of time deemed appropriate; or

    (C) impose additional conditions and restrictions on the approved application of the foreign nation involved and on any permit issued under such application.

    Any permit which is suspended under this paragraph for nonpayment of a civil penalty shall be reinstated by the Secretary upon the payment of such civil penalty together with interest thereon at the prevailing rate.

The offenses charged against the Kaiyo Maru No. 53 are acts prohibited by 16 U.S.C. § 1857.

**34.** 16 U.S.C. § 1859(a)(2).

**35.** *See* 16 U.S.C. § 1855(g).

**36.** 50 C.F.R. §§ 601.1 *et. seq.* (1978).

**37.** 50 C.F.R. § 621.51–621.56 (1978).

**38.** *Id.* § 621.54(a).

**39.** *Id.*

**40.** *Id.*

**41.** *Id.*

"make the permit sanction effective immediately or otherwise earlier than 30 days after the date of the notice of the permit sanction if he finds, and summarizes such finding and the basis therefor in the notice, that substantial harm to a fishery resource of the United States may result from a later effective date."[42] In such case an expedited hearing is required.[43]

■ The claimant was sent a notice of permit sanction in compliance with the regulations from the National Oceanic and Atmospheric Administration, United States Department of Commerce. The notice revoked the vessel's fishing permit "effective immediately" for violating the provisions of the Act. The basis for the immediate revocation was the assistant administrator for fisheries' determination that:

> I find the above-described offenses to be of a willful and egregious nature, so as to present the risk of substantial harm to the affected resources should the activities of the KAIYO MARU No. 53 be permitted to continue. In making this determination, I have considered, among other factors, the intentional and willful nature of the violations, the likelihood of the optimum yield of the affected species being substantially exceeded should these and other violations of similar magnitude be repeated, and the impact on the fishery should the United States fail to vigorously safeguard resources under its exclusive jurisdiction by forcefully deterring violations of this nature.[44]

The notice indicated the claimant's right to an expedited hearing concerning the revocation, but stated that such a request would not delay the effective date of the permit sanction.[45] Defendant and claimant contend that the immediate revocation of their permit without prior opportunity for a hearing violates the statutory scheme and is constitutionally infirm.

Permit sanctions are authorized under 16 U.S.C. § 1824(b)(12). If a civil penalty assessed under the Act is unpaid, a sanction must be imposed. A mandatory sanction is also required if a criminal fine is not paid. Finally, a sanction may be imposed if a foreign fishing vessel *has been used* in the commission of an act prohibited by the Act. The permit sanction against the KAIYO was imposed under this latter provision.

Claimant argues that the language "has been used" necessitates a prior determination that the vessel has committed the prohibited acts. The government argues that "has been used" refers to objective facts which can later be verified. Since both interpretations are possible, examination of legislative history to discern the intent of Congress is appropriate. *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1172 (9th Cir. 1979).

Early Senate versions of the Act contained no provision comparable to the permit system which emerged in the final bill.[46] The House version of the bill, however, included a permit system.[47] It is significant that the House bill provided for suspension or revocation of permits only for failure to pay an assessment or if the Secretary of Commerce made a finding that a

---

**42.** *Id.* § 621.54(c).

**43.** *Id.*

**44.** Claimant has contended that this notice does not comply with the requirements of 50 C.F.R. § 621.54(c) in that the *basis* for the Director's findings is not adequately stated. While the findings are conclusory, the factors which have been considered in reaching these conclusions are adequately stated. I find the notice meets the requirements of the regulation.

**45.** Claimant made a timely request for such a hearing. The hearing would be held by an administrative law judge whose decision would be appealable to the agency head, the same individual who initially revoked the permit. By agreement of the parties the hearing has been stayed pending resolution of this matter by the court.

**46.** *See* S. 961, 94th Cong., 1st Sess. (1976).

**47.** H.R. 200, 94th Cong., 1st Sess. (1976); for a comparison of the House and Senate versions of the bill see *A Legislative History of the Fishery Conservation and Management Act of 1976*, 94th Cong., 2d Sess. (1976) at 117.

vessel had been repeatedly used in the commission of acts prohibited under the Act.[48]

The permit system, as it appears in the final legislation, originated in the conference committee. The committee report in relevant part states:

> Paragraph (12) deals with sanctions relating to permits issued under this subsection (i. e. under a governing international fishery agreement). If a fishing vessel of a foreign nation holding such a permit is used in the commission of any act prohibited by section 307, or if overdue criminal penalties under section 309 or overdue civil penalties under section 310 (pertaining to that vessel) have not been paid, the Secretary may revoke the permit (and may bar future permits for a specified number of years); may suspend the permit for an appropriate period of time; or may impose additional conditions and restrictions on all of the permits issued to the nation under whose flag that vessel operates. The Secretary is not required to give notice or hold any kind of hearing prior to such permit revocation, suspension, or modification *since a hearing will already have been held to determine whether the vessel was in fact used in the commission of a prohibited act* (or in the assessment of a civil penalty under section 308(a) or the imposition of a criminal penalty under section 309). If a permit is suspended for nonpayment of a civil penalty, the permit must be reinstated upon payment of that penalty plus interest. (emphasis added) [49]

The conference report reflects the understanding of Congress that a hearing would be held prior to any permit sanction. I also find it noteworthy that the other bases for imposing a permit sanction all anticipate a prior finding that provisions of the Act have been violated.

■ I conclude that Congress intended that a permit sanction be imposed only after a hearing had been held to determine whether the vessel was in fact used in the commission of an act prohibited by the Act. Absent a hearing, the permit may not be revoked. Since a hearing is statutorily required, it is not now necessary to determine whether such a prior hearing is also constitutionally mandated.

## THE SEARCH

The defendant maintains that the boarding and search of the KAIYO by the Coast Guard without a warrant constituted a violation of the Fourth Amendment. Before reaching that issue, however, it is necessary to address defendant's argument that the Act itself does not authorize routine warrantless searches.

### 1. *Statutory Authorization*

The statute provides in relevant part:

(b) *Powers of authorized officers.*— Any officer who is authorized by the Secretary, the Secretary of the department in which the Coast Guard is operating, or the head of any Federal or State agency which has entered into an agreement with such Secretaries under subsection (a) of this section to enforce the provisions of this chapter may—

(1) with or without a warrant or other process—

(A) arrest any person, if he has reasonable cause to believe that such person has committed an act prohibited by section 1857 of this title;

(B) board, and search or inspect, any fishing vessel which is subject to the provisions of this chapter;

(C) seize any fishing vessel (together with its fishing gear, furniture, appurtenances, stores, and cargo) used or employed in, or with respect to which it reasonably appears that such vessel was used or employed in, the violation of any provision of this chapter;

(D) seize any fish (wherever found) taken or retained in violation of any provision of this chapter; and

---

**48.** H.R. 200, 94th Cong., 1st Sess. § 204(h) (1976).

**49.** Joint Explanatory Statement of the Committee of Conference, Senate Conf. Rep. No. 94–711, *reprinted in* 1976 U.S. Code Cong. & Ad. News at 665.

(E) size any other evidence related to any violation of any provision of this chapter;

18 U.S.C. § 1861(b).

■ The KAIYO claims that the obvious meaning of the language "with or without a warrant" indicates the intent of Congress that a warrant will ordinarily be required before Coast Guard boarding. Regretably, the legislative history is silent on the matter. However, when the Act is read in context, I am satisfied that Congress intended to allow boarding and search of foreign vessels without a warrant.

By its terms the Act requires that foreign nations and the owner or operator of any fishing vessel fishing pursuant to a governing international fishery agreement must allow official United States observers on board the vessel.[50] Additionally, the foreign nation and the owner or operator of any foreign fishing vessel must agree to permit any authorized officer to board and search or inspect the vessel operating under federal permit at any time.[51] They also must agree to abide with the monitoring, compliance or enforcement requirements that may be included in a governing international fishery agreement. The Act requires any permit issued under it to be prominently displayed in the wheelhouse of any vessel performing operations requiring a federal permit. The permit must be shown upon request to any officer authorized to enforce the Act. It is a violation of the Act to refuse to allow any authorized officer to board a fishing vessel for the purpose of conducting any search or inspection in connection with its enforcement.[52] The implementing regulations also require that certain records and logbooks be kept and authorize the inspection of these logbooks by authorized officers at any time.[53]

In view of these provisions, I conclude that Congress intended to authorize boarding and search of foreign fishing vessels without the requirement of a warrant. It makes little sense to require owners or operators of foreign vessels to accept official United States observers aboard their vessels, and to agree as a condition for a permit that authorized officers may board and inspect their vessels, while requiring the Coast Guard to obtain a warrant before doing so. Nor is it reasonable to require the federal permit to be prominently displayed in the wheelhouse for inspection by a Coast Guard officer upon request while similtaneously requiring the officer to obtain a warrant before making an inspection.

## 2. The Constitutional Requirements

Since in this instance the Coast Guard had neither probable cause to believe a violation had occurred nor exigent circumstances apparent prior to boarding, a warrant was constitutionally required in order to detain and search the vessel unless the search should fall within that narrow exception recognized for warrantless searches in pervasively regulated industries.

In *Colonnade Catering Corp. v. U. S.,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) a government agent, upon being refused admission into a locked liquor stockroom on licensed premises, broke the lock to enter and seized liquor upon which it was claimed taxes had not been paid. The United States Supreme Court concluded that while Congress had authorized prosecution for refusal to admit for purposes of statutorily authorized inspection, Congress had not seen fit to permit a forcible entry without a warrant. Therefore, a warrantless entry accomplished by force was not permissible. The Court, however, recognized the power of Congress to authorize warrantless entries in the liquor industry.

The issue of warrantless searches was again before the Court in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). That case had to do with

---

**50.** 16 U.S.C. § 1821(c)(2)(D).

**51.** 16 U.S.C. § 1821(c)(2)(A)(i).

**52.** 16 U.S.C. § 1857(1)(D).

**53.** 50 C.F.R. § 611.9.

inspections under the Gun Control Act[54] which authorized official entry into the premises of a firearms or ammunition dealer during business hours for the purpose of examining records and the stock of goods kept or stored by the dealer on the premises. In *Biswell* a pawnbroker, informed by federal agents that he was required by law to allow inspection, unlocked the storeroom in which illegal firearms were found. The Court distinguished *Colonnade*, concluding that the search in *Biswell* was not accompanied by forcible entry and was reasonable. However, the Court noted that warrantless inspections of closely regulated businesses must be limited in time, place and scope, and that legality of the search rests not on consent but on the authority of a valid statute. Since regulation of firearms involved important governmental interests and inspection was necessarily a crucial part of the regulatory scheme, the statute authorizing warrantless searches was reasonable under the Fourth Amendment. Finally, in *Biswell* the Court concluded that the prerequisite of a warrant could easily frustrate inspection, and if necessary flexibility as to time, scope and frequency was to be preserved, any protection afforded by a warrant would be negligible. Compliance with the Gun Control Act posed only limited threats to the dealer's justifiable expectations of privacy, and dealers choosing to engage in a pervasively regulated business under federal license must do so with the knowledge that their business records, firearms, and ammunition were subject to inspection.

In *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), the Supreme Court clarified the administrative search exception. The distinguishing element giving rise to the exception in pervasively regulated *Biswell* businesses or traditionally regulated *Colonnade* industries, according to the Court, is the awareness and expectation by persons entering such a business that they are subjecting themselves to pervasive government supervision and regulation. Under these conditions, no reasonable expectation of privacy can exist for the proprietor of the enterprise. *Id.* Citizens "engaged in such federally licensed and regulated enterprises [must] accept the burdens as well as the benefits of their trade.... The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Almeida-Sanchez v. United States*, 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973).

Claimant argues that this search does not fall within the *Biswell-Colonnade* exception because federal regulation of the fishery zone is a recent development compared to regulation of the industries where warrantless inspections have been allowed. In addition, claimant asserts that enforcement officers are allowed undue discretion under the statute.

■ Contrary to claimant's contention, the *Biswell-Colonnade* exception does not stress the length of time over which an industry has been regulated, but rather the pervasiveness of that regulation once begun. *Biswell* stresses as well the importance of the government interest involved, and the cruciality of inspection to the regulatory scheme. The Act is pervasive in that it establishes a comprehensive system of federal control in which the reliability of self-reporting required of fishing vessels, only occasionally augmented by observer's reports, is the key to the success of the management program. It is essential that the Coast Guard, in its important inspection role, be able to detain fishing vessels to examine the records[55] required of vessels permitted to fish in the conservation zone, and to check the catch of fish.[56] Finally, there can be no doubt that federal management of fishery resources within the fishery conservation zone involves vital government interests in protecting and insuring renewal of the resource and, thus, of the future of the fishermen who depend upon it.

**54.** 18 U.S.C. § 921 *et seq.*

**55.** 50 C.F.R. § 611.9.

**56.** 50 C.F.R. § 611.3.

The Act does not permit enforcement officers discretion which is unreasonable. Search is restricted to those fishing vessels engaged in actual fishing within the zone.[57] The search conducted in this case and in the many other routine searches performed by the Coast Guard was limited to regulation enforcement: inspecting the catch and checking the required records. The Coast Guard order carefully restricts boardings to those conducted under the authorization of the Act and a few other instances. The order does not permit general boarding in search of contraband or in execution of the criminal laws for which statutory authority has not been given. While the Act authorizes searches at any time, this is reasonable since fishing in the zone may occur day or night. Lastly, the area of Coast Guard operations beyond the territorial seas of Alaska encompasses thousands of square miles in the North Pacific and the Bering Sea. It would be impractical and therefore unreasonable in many instances to require a warrant before detaining and boarding a vessel to determine if it is in compliance with the requirements of the Act under which the permit is issued.

It is important to note that the *Biswell-Colonnade* exception also requires, as *Marshall* makes clear, that people entering a pervasively regulated business be aware that they are subjecting themselves to such regulation at the outset since they then cannot have a reasonable expectation of privacy in the regulated area. It is obvious, in view of permit requirements, that a fishing vessel operating within the fishery conservation zone must expect boarding and inspection to determine whether it is in compliance with the regulations under which it is permitted to fish. The conditions under which permits are issued have been formally agreed to by treaty with foreign governments and by each foreign owner or operator of a vessel authorized to fish in the zone. Hence, there can be no reasonable expectation of privacy regarding

necessary examination of the records and inspection of the catch by Coast Guard boarding parties.

The Ninth Circuit has only recently held that warrantless searches of commercial fishing vessels fell within the *Biswell-Colonnade* warrant exception. *United States v. Raub,* 637 F.2d 1205 (9th Cir. May 22, 1980). Although *Raub* dealt with the Sockeye Salmon or Pink Salmon Fishing Act of 1947[58] and the regulations implementing the Point Elliot Treaty,[59] the decision quotes approvingly from *United States v. Tsuda Maru,* 470 F.Supp. 1223 (D.Alaska 1979) which dealt with this same issue under the Fishery Conservation Management Act of 1976.

For all of the stated reasons, I conclude that the provisions of the Act allowing warrantless searches fall within the *Biswell-Colonnade* exception and are lawful under the Fourth Amendment.

## DISCRIMINATION AGAINST ALIENS

■ Claimant next argues the Act violates the Fifth Amendment in that it discriminates against aliens as a class. This argument has already been considered by this court in *United States v. Tsuda Maru,* 479 F.Supp. 519 (D.Alaska 1979). There, Judge von der Heydt held that the Act did not unlawfully discriminate against aliens. I agree and also hold that the Act does not violate the equal protection component of the Fifth Amendment for the reasons expressed there.

## LACK OF STANDARDS AND GUIDELINES

■ Claimant also argues that the Act violates the due process clause of the Fifth Amendment in that it fails to indicate what conduct is possible and what sanctions will be imposed for such conduct. Essentially the claimant argues that because any one of several sanctions[60] can be imposed for any violation of the Act, the Act should be held unconstitutional.

---

**57.** Operation Order 201 at 71.

**58.** 16 U.S.C. §§ 776–776f.

**59.** 50 C.F.R. §§ 371.1–.9 (1978); 25 C.F.R. §§ 256.1–.21 (1971).

**60.** *See* 16 U.S.C. §§ 1857–1861.

This argument has no merit. Section 1857 and its implementing regulations clearly specify what conduct is prohibited. Moreover, I hold as well that the Act clearly establishes what sanctions may result from the prohibited conduct. That the provisions allow the government discretion to choose which sanction is appropriate in a particular case [61] does not render the statute unconstitutionally vague. Such prosecutorial discretion has long been recognized as permissible. *See Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *Arnold v. McCarthy*, 566 F.2d 1377 (9th Cir. 1978); *United States v. Hall*, 559 F.2d 1160 (9th Cir. 1977). That Congress may have given the secretary flexibility in deciding what sanction to impose does not render the Act unconstitutional.

ARREST OF THE VESSEL

Claimant argues that the arrest of the vessel pursuant to Admiralty Rule C and the Act was unconstitutional as it violated the right to due process. This argument is premised on the United States Supreme Court's decisions in *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) and *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). In both those cases statutes, which allowed for seizure of property without prior hearing or notice, were held to violate fundamental principles of due process. Defendant argues that Admiralty Rule C [62] similarly violates due process requirements.

The Supreme Court has recognized that there are "extraordinary situations" that justify postponing notice and opportunity for a hearing. *Sniadach v. Family Finance Corp., supra* at 339, 89 S.Ct. at 1821. Among such situations recognized in *Fuentes* is attachment necessary to secure the court's jurisdiction. 407 U.S. at 91 n.23, 92 S.Ct. at 1999 n.23. Admiralty Rule C is essential in order to obtain *in rem* jurisdiction over a vessel in a forfeiture action. *The Brig Ann*, 13 U.S. (9 Cranch) 289, 291, 3 L.Ed. 734 (1815).

In *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), the Supreme Court upheld seizure of a vessel for forfeiture purposes under a Puerto Rican statute similar to Rule C. The Court relied on the extraordinary situation exception of *Fuentes* stating that seizure under the Puerto Rican statute was justified for several reasons:

... First, seizure under the Puerto Rican statutes serves significant governmental purposes: Seizure permits Puerto Rico to assert *in rem* jurisdiction over the property in order to conduct forfeiture proceedings, thereby fostering the public interest in preventing continued illicit use of the

---

61. The Coast Guard has attempted to provide guidelines as to what sanctions are appropriate for different violations. *See* Operation Order 201 at 67–70.

62. Admiralty Rule C provides in part:
(1) When Available. An action *in rem* may be brought:
(a) To enforce any maritime lien:
(b) Whenever a statute of the United States provides for a maritime action *in rem* or a proceeding analogous thereto....
(2) Complaint. In actions *in rem* the complaint shall be verified on oath or solemn affirmation.
It shall describe with reasonable particularity the property that is the subject of the action and state that it is within the district or will be during the pendency of the action. In actions for the enforcement of forfeitures for violation of any statute of the United States the complaint shall state the place of seizure and whether it was on land or on navigable waters, and shall contain such allegations as may be required by the statute pursuant to which the action is brought.
(3) Process. Upon the filing of the complaint the clerk shall forthwith issue a warrant for the arrest of the vessel or other property that is the subject of the action and deliver it to the marshal for service...
(4) Notice. No notice other than the execution of the process is required when the property that is the subject of the action has been released in accordance with Rule E(5). If the property is not released within 10 days after execution of process, the plaintiff shall promptly or within such time as may be allowed by the court cause public notice of the action and arrest to be given in a newspaper of general circulation in the district, designated by order of the court. Such notice shall specify the time within which the answer is required to be filed as provided by subdivision (6) of this rule...

property and in enforcing criminal sanctions. Second, preseizure notice and hearing might frustrate the interests served by the statutes, since the property seized—as here, a yacht—will often be of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given. And finally, unlike the situation in *Fuentes*, seizure is not initiated by self-interested private parties; rather, Commonwealth officials determine whether seizure is appropriate under the provisions of the Puerto Rican statutes. . 416 U.S. at 679, 94 S.Ct. at 2089. The seizure and arrest of vessels as part of the forfeiture provisions of the Act is similarly a crucial element of the enforcement provisions of that Act. Enforcement would be much more difficult, if not impossible, were advance warning of seizure necessary. Moreover, unlike the *Fuentes* situation, the seizure and arrest of vessels for violations of the Act is not initiated by self-interested private parties but is done under direction of the Coast Guard after consultation with the United States Departments of State and Commerce.

█ I conclude, therefore, that the arrest of the KAIYO MARU under Admirality Rule C and the Act was constitutional. The arrest, to obtain *in rem* jurisdiction of the vessel for forfeiture proceedings, falls within the extraordinary situation exception recognized in *Fuentes* and in *Sniadach* and did not violate due process.

THE FORFEITURE ISSUE

The government contends that any fishing vessel (including its fishing gear, furniture, appurtenances, stores and cargo) and any fish taken or retained in any manner in connection with or as a result of the commission of any act prohibited by the Act (other than an act for which the issuance of a citation is sufficient sanction) shall be subject to forfeiture to the United States. The Act provides that all or part of such vessel may, and all such fish shall, be forfeited to the United States pursuant to civil

proceedings brought in district court.[63] Although the government concedes that fishing gear, furnishings, stores and cargo of a fishing vessel may be forfeited in lieu of a forfeiture of the entire vessel, it contends the court may not establish a monetary value for the fishing vessel and forfeit only part of that amount.

I disagree with the government's interpretation for several reasons. First, it appears the Act was especially intended to relieve the restrictive forfeiture provisions of its predecessor, the Bartlett Act, which required forfeiture of the entire vessel or nothing. As observed by one commentator:

In several important respects, the FCMA preserves the forfeiture scheme of the Bartlett Act. First, the Act *requires* the forfeiture of all illegally taken or retained fish, although this forfeiture is not enforced if for any reason the Justice Department declines to invoke the jurisdiction of the district courts. The vessel itself continues to be merely "subject to forfeiture." The discretion thus created, however, is expanded over that available to the district courts under the Bartlett Act, in that the first clause of the second sentence of section 310(a) permits forfeiture of "[a]ll or part" of an offending vessel. Ways had been found to evade the apparent all-or-nothing forfeiture provision of the Bartlett Act even when a case was litigated, but the new law gives welcome express recognition to the possibility that forfeiture of more than the illegal catch but less than the entire vessel might be warranted.

Fidell, *Enforcement of the Fishery Conservation and Management Act of 1976: The Policeman's Lot*, 52 Wash.L.Rev. 513, 540 (1977).

█ Under 16 U.S.C. § 1860(a), *all* fish seized where a violation is found must be forfeited. However, in providing that all or part of the fishing vessel might be forfeited, Congress intended to vest some discretion in the court to determine the extent forfeiture is to apply against the vessel. This interpretation is buttressed when other

**63.** 16 U.S.C. § 1860.

related provisions of the Act are examined. Subsection (d) of 18 U.S.C. § 1860 provides that any officer authorized to serve process *in rem* issued by the court shall stay execution of the process upon receipt of a satisfactory bond or other security from any claimant. The bond or other security must be conditioned upon delivering the property to the appropriate court upon its order or by paying in the monetary value of such property pursuant to court order. This suggests that in the event that a fishing vessel is discharged on bond, the court, upon declaring forfeiture, may declare that the vessel be delivered up in execution of the decree or that the monetary value of the vessel be paid over on court order. Moreover, judgment may be recovered on the bond or other security against both principal and surety as ordered by the court.

Reading these sections together, I conclude that Congress entrusted the courts with jurisdiction to accept a satisfactory bond in lieu of the vessel and to discharge the vessel from seizure. The bond is intended to insure the satisfaction of any decree forfeiting the vessel, its fishing gear, its stores or such monetary sum as should be ordered in the exercise of the court's discretion in the matter.

THE PENALTY

Since I find that the KAIYO has violated the Act, the final question is what penalty should be assessed. The government contends that in this case forfeiture is necessary in order to deter future violations. A number of violations by foreign fishing vessels in the Fishery Conservation Zone have followed the arrest and seizure of the KAIYO.[64]

■ Certainly deterrence of future violations of the Act is an important factor in the final disposition of this case. Accurate and truthful reporting by fishing vessels is the foundation upon which the entire regulatory program is built. The preservation of adequate fishery stocks for future generations of fishermen is at stake, and the offense in this case is egregious since at the time the KAIYO was apprehended she was guilty in substantial underlogging of some species and had made a substantial catch of immature halibut, a prohibited species.

If deterrence is to be effective, the penalty must be more than a cost of doing business in the Fishery Conservation Zone. While it is difficult to evaluate what amount is necessary to limit any possible profit from illegal fishing in the zone, I have reviewed the settlements of fishing violations against other vessels involved in similar occurrences. The penalties exacted have ranged from $40,000 to $700,000 plus a four-month permit suspension.[65]

64. *See* last eight entries in note 65, *infra*.

65. The following table represents all the vessel seizure cases which have been resolved in the District of Alaska since the effective date of the FCMA:

| Name of vessel | Date seized | Violation | Length/Gross tonnage | Disposition |
|---|---|---|---|---|
| Highly No. 301 | 9/2/77 | Unauthorized species | 66.5m 979 | $335,000 settlement |
| Sachi Maru No. 22 | 2/23/78 | Prohibited area | Unk Unk | $200,000 settlement |
| Tsuda Maru | 1/27/79 | Underlogging, Overlogging last day | 335' 5500 | $700,000 settlement plus 4 month permit suspension |
| Fukui Maru No. 8 | 2/19/79 | Underlogging, Overlogging | 176' 350 | $225,000 settlement |
| Don Won No. 31 | 6/21/79 | Underlogging | 59m 481 | Settled for violation rpt. & Marshal's fees |
| Highly No. 301 | 8/20/79 | Underlogging | 66.5m 979 | $500,000 settlement w/Highly No. 302 |

The claimant suggests that the real offenders are not before the court arguing that the owners of the KAIYO met their obligation by employing qualified and responsible officers and crew for the vessel. The captain and the fishing master were instructed to comply with the regulations in the Fishery Conservation Zone, and when it became apparent that they had become involved in illegal violations of the regulations, the owners promptly discharged them. On previous fishing expeditions when the vessel was boarded she was found to be in full compliance with the law.

I conclude, however, that the claimant must be held legally responsible for any violations resulting from the fishing operations of the vessel. The regulatory program is designed to punish the vessel and its owners for any transgressions, and it is apparent that for effective enforcement of the law this must be so.

The Kaiyo Gyogyo Company, owner of the KAIYO, is a small family operation. Forfeiture of the vessel will hopelessly bankrupt the company. This is to be taken into consideration. *Cf. United States v. United Mine Workers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1974). (contempt proceeding)

Additionally, the sanctions, penalties and losses already incurred by the KAIYO are substantial. The vessel's United States fishing permit was temporarily suspended and a subsequent sanction by the Japanese government confined her to port in Hachinoke. In all, the KAIYO lost nine months of fishing time.

I conclude upon consideration that in this case forfeiture of the vessel is not warranted. However, the full catch of the KAIYO shall be forfeited to the United States. In addition, the owners of the KAIYO are required to pay a penalty of $450,000 which is now assessed against the vessel.

I believe that in addition to the losses already suffered by the KAIYO the penalty now imposed is a heavy one. Forfeiture in an appropriate case might well be justified but in the present circumstances the penalty assessed, together with the other sanctions imposed or suffered, should be sufficient deterrence to impress potential transgressors.

| Name of vessel | Date seized | Violation | Length/Gross tonnage | Disposition |
|---|---|---|---|---|
| Highly No. 302 | 8/20/79 | Underlogging | 58m 988 | Joint settlement w/Highly No. 301 |
| Fukuyoski Maru No. 8 | 9/28/79 | Underlogging | 185' 500 | $215,000 settlement |
| Seo Yang Ho | 10/9/79 | Underlogging, Overlogging, false transfer log | 314' 3527 | $400,000 settlement with Pung Yang Ho, plus 2 months permit suspension |
| Pung Yang Ho | 10/9/79 | Underlogging, false transfer log | 314' 3527 | Joint settlement with Seo Yang Ho |
| Golden Dragon No. 1 | 2/8/80 | Underlogging, not promptly returning prohibited species | 78.5m 1900 | $40,000 settlement |
| Zelenograd | 3/11/80 | Underlogging | 92m 3600 | $400,000 settlement |