Jasen, J.
(dissenting). The majority holds today that the private sale on notice to the owner of a vehicle to satisfy a *168 garageman’s lien, as regulated by statute (Lien Law, §§ 200, 201, 202, 204), is violative of the due process clause of the State Constitution. I disagree and would sustain the constitutionality of the challenged statutes on the ground that the statutory scheme does not involve State action and, therefore, may not properly be measured against due process standards applicable only when State action is present.
Confronted by a controlling decision of the United States Supreme Court, the majority declines, as indeed it must, to hold these statutes violative of the due process clause of the Federal Constitution. In Flagg Bros. v Brooks (436 US 149), the argument was rejected that a private sale of goods subject to a warehouseman’s lien as authorized by section 7-210 of the Uniform Commercial Code, a statute strikingly similar to those challenged in this case, constitutes State action.[1] The court observed that it is immaterial that a warehouseman’s lien is statutory, emphasizing that the statute does not encourage the warehouseman to engage in any activity. "Here”, the court said, "the State of New York has not compelled the sale of a bailor’s goods, but has merely announced the circumstances under which its courts will not interfere with a private sale.” (Flagg Bros. v Brooks, supra, at p 166.) The court concluded that the realm of private commercial transactions is inappropriate for an expansive application of the sovereign function doctrine of State action.
Particularly paradoxical is that the present overturning of commercial legal principles occurs in a court noted throughout its history for its sensitivity and leadership in the commercial field. In doing so, the majority refers to the State action doctrine, the ground for its holding, as an "elusive principle” at p 158). Significant, too, is that the principles now being applied so hastily and with such novelty will proliferate similar litigation and by analogy propagate similar applications in parallel commercial lien transactions. This hasty embrace of novel doctrine follows on the heels of the rejection of the same attempted extension of the State action doctrine by the very court which gave initial impetus to the doctrine in more appropriate contexts. Moreover, this rejection by the *169 Supreme Court undermines the reasoning and the authorities upon which the Appellate Division relied and respondent also relied until their repudiation by the Supreme Court.
I believe the analysis in Flagg applies with equal force to the statutes challenged today. Not only is a private commercial transaction involved here, but the interest of the garage-man in a chattel, having stored it and having enhanced its value, is more substantial than the interest of a warehouseman, who merely stores a chattel.
The majority, however, asserts that "the mere fact that an activity might not constitute State action for purposes of the Federal Constitution does not perforce necessitate that the same conclusion be reached when that conduct is claimed to be violative of the State Constitution.” (At p 159.) Particularly in a case such as this involving commercial transactions, I would be reluctant to hold, as the majority does, that State and Federal due process protections are not coextensive. "The clauses”, we said in Central Sav. Bank v City of New York (280 NY 9, 10), "are formulated in the same words and are intended for the protection of the same fundamental rights of the individual and there is, logically, no room for distinction in definition of the scope of the two clauses.” There is little difference of constitutional dimension for State action purposes between the two clauses. Both clauses are aimed directly at limiting the ability of State government to deal unfairly with its citizens. Clearly, then, the due process clauses are limited in their operation to situations where there is State involvement. This emphasis on State action ensures that citizens are protected from arbitrary and capricious action by the State.
Apparently the majority concedes that under the State Constitution due process may not be invoked absent "State involvement”. I would add that the State involvement must be significant, rather than incidental. Traditionally, an inquiry into whether the State is significantly involved in private activity has focused on the nexus between the government and the private conduct. A close entwinement between the two has resulted in a finding of State action. Thus, where the State reaps some benefit from the private conduct (Phillips v Money, 503 F2d 990, cert den 420 US 934), or where the State encourages the private activity (Reitman v Mulkey, 387 US 369), State action has been found. To be sure, participation of government agents or officials may signal the presence of *170 State action (Fuentes v Shevin, 407 US 67; Sniadach v Family Fin. Corp., 395 US 337).
But the presence or absence of State action may not be determined simply by tallying the number of connections between the State and a particular private activity. Nor can it be said that the mere statutory authorization of an activity signals that the State has become a participant or has encouraged the activity. (Flagg Bros. v Brooks, 436 US, at pp 164-166, supra; Moose Lodge No. 107 v Irvis, 407 US 163; Davis v Richmond, 512 F2d 201.) A fundamental role of government is to provide rules for private persons in private transactions which will lend guidance to those whose private interests are in conflict. Such is the mechanism for preserving an orderly and viable society. Exercise of this governmental regulatory and rule-making power alone in an otherwise free society, does not necessarily manifest State action, for of paramount concern is how the acts of government impact on the ordering of private rights and interests. Vindication of a substantial private interest by law may not constitute State action, while State action is more readily found in a law which propels an insubstantial interest of one individual over a more substantial interest of another. (Note, State Action and the Burger Court, 60 Va L Rev 840, 841; Burke and Reber, State Action, Congressional Power and Creditors’ Rights: An Essay on the Fourteenth Amendment, 47 S Cal L Rev 1, 52.) Application of the concept of State action by the courts indicates the validity of this approach. The concept was originally developed and greatly expanded in racial discrimination cases involving denials of equal protection, an area of intense judicial concern and substantive constitutional interest. (Shelly v Kraemer, 334 US 1, 23.) Where racial discrimination has not been at issue, however, courts have construed the State action concept more narrowly. (Adams v Southern Cal. First Nat. Bank, 492 F2d 324, 333, cert den 419 US 1006; Coleman v Wagner Coll., 429 F2d 1120, 1127 [Friendly, J., concurring].)
Since the garageman’s lien (Lien Law, § 184) is merely a modern statutory codification of the ancient artisan’s lien, a proper application of the indices of State action to the case before us may be made only after reviewing the common-law artisan’s lien. At common law, a workman who, with the consent of the owner, enhanced the value of a chattel, obtained an artisan’s lien on the chattel for the reasonable value *171 of the work performed. (Morgan v Congdon, 4 NY 552, 553; 1 Jones, Liens [2d ed], § 731, p 480.) The equity of this fundamental principle of law is readily grasped, for a workman having invested his labor, time and materials in repairing or maintaining another’s personal property must be extended some means of securing just compensation. (Brown, Personal Property [3d ed], § 13.2, p 398.) No one contends in this case, nor could one seriously contend, that the common-law creation of the artisan’s lien involved State action. Such a lien reflected the legal mechanism fashioned to accommodate the competing interests of the artisan and the owner of personal property. Both the private nature of the interests and the lack of governmental participation in the resolution of the conflict removed the artisan’s lien from the ambit of State action. Likewise, statutory codification of the common-law lien is equally unsuited to State action classification, legislative enactments having altered merely the form, rather than the substance, of the artisan’s lien. (IDS Leasing Corp. v Hansa Jet Corp., 51 AD2d 536, affg 82 Misc 2d 741; Melara v Kennedy, 541 F2d 802; see Lien Law, §§ 180, 184, 185, 186.)
While the challenged statutory scheme authorizes more than a mere possessory lien, permitting the lienor to conduct a foreclosure sale of the chattel (Lien Law, § 200) subject to strict notice requirements (Lien Law, §§ 201, 202), such an expansion of rights is merely an exercise of the State’s regulatory powers to provide guidelines for the resolution of legitimate divergent interests. The garageman, having enhanced the value of the chattel, has obtained a significant property interest in it. This interest served as the springboard for the creation of the common-law artisan’s lien, and it similarly supports statutory authorization for the lienor to foreclose the lien. Indeed, a mere possessory lien without the right to sell would offer little benefit to the garageman who might ultimately bear the expense and inconvenience of storage of the vehicle indefinitely. Such a burden could defeat the very purpose sought to be achieved by the lien. The right to foreclose, upon proper prior notice to the owner, is therefore both a reasonable and necessary means of insuring that the lien will serve its intended purpose. By contrast, the rights of the owner of the chattel are affected only minimally by the sale, since the lienor’s right to possession continues indefinitely until satisfied. The substantial interests of the garageman in the chattel, and the lesser impact that these statutes have *172 on the interests of the owner, compel the conclusion that these statutes have not worked a significant reordering of the interests involved. The challenged private conduct should therefore not be attributed to the State.
Moreover, the other indices of State action are not present to any significant degree. No benefit inures to the State by operation of these statutes, nor is the State encouraging the lienor to take any action whatever; the initiative rests with the lienor. As to governmental participation, it cannot be argued persuasively that the purely incidental involvement of a licensed auctioneer, who conducted the sale, or of the Department of Motor Vehicles, which transfers title of vehicles, rises to the level of State action, any more than that the use of the post office to mail the notice of sale constitutes Federal action. Indeed, the majority agrees that the State involvement must be more than just that and that it must be a "rather significant State involvement.” (At p 158.)
In concluding that no State action is present in this case, I am mindful that in Blye v Globe-Wernicke Realty Co. (33 NY2d 15), we found that the seizure of property by an innkeeper pursuant to section 181 of the Lien Law constituted State action. The rationale of that decision was that the innkeeper, in seizing a guest’s property, has executed his own seizure under the lien. This procedure resembles a seizure in satisfaction of a judgment, a traditional function of the Sheriff. But in Blye, we did not hold that the performance of any governmental function is necessarily State action. Implicit in that decision we recognized the nature of the competing interests of the parties. The interest of the guest to be free from the forcible seizure of his personal property was exalted above the interest of the innkeeper to satisfy a lien for use of premises and incidental services, by seizing property bearing no relationship to the lien. The statutes challenged today stand in a significantly different posture, since the property subject to the lien, having been voluntarily delivered to the garageman, is seized by neither the lienor nor the Sheriff. Moreover, in contrast to the innkeeper, the garageman, in enhancing the value of the chattel, has acquired a substantial interest in the detained property.
The majority, however, strains to reject this analysis so that it may nullify the challenged Lien Law provisions. However laudable the intentions of the majority may be, its ruling can only glut the commercial realm with pointless and trivial *173 litigation. Surely, in the vast majority of cases where a garageman’s lien goes unsatisfied, the value of the lien is uncontested and insufficient to warrant litigation. Our Legislature, apparently aware of this problem, enacted the statutes in question merely to extend to all lienors the right of sale, recognized at common law in a pledge of personal property, with certain added stringent provisions as to notice of the impending sale to the owner inserted for his protection. These notice requirements were imposed to insure that the owner of the vehicle is informed of the proposed sale and has ample opportunity to take action to protect his interests. We should not interfere with this reasonable regulation of private conduct.
The majority opinion states that "[a]bsent consent of the debtor, the power to fashion the means to order legally binding surrenders of property has always been exclusively vested in the State” (at p 162). I assume that the majority refers, among other things, to the classic pledge of personal property in which the pledgor expressly or impliedly "consents” to private sale of the pledged chattel in the event of default. The distinction, if that it be, from the statutory right to private sale in the event of a default in the obligation which gave rise to the lien is verbalistic. It is just as correct to say that the owner who gives possession of property for purposes of repair or other enhancement consents to the statutory right to execute the lien. He certainly does so impliedly, in the same way that innumerable other private transactions imply, as a matter of law, statutory obligations and conditions which affect property interests. (E.g., insurance policies, negotiable instruments [especially if collateralized], leases of real property, powers of attorney, general releases, covenants not to sue, rights of entry and rights to notice of termination in leaseholds [whether for a term or at will], contracts of employment, and the like.) The shallowness of the distinction is exposed by the fact that any garageman who, at the behest of a lawyer, added a pledge of the vehicle to secure the service charges for repair or storage would avoid what the court today holds to be a violation of constitutional due process.
Moreover, the court has severely afflicted the sphere of private commercial transactions, for this ruling applies equally to the numerous other liens on personal property which were enforceable by the provisions now declared uncon *174 stitutional. (Lien Law, § 180 [artisan’s lien on personal property]; § 183 [veterinarians and bailees of animals]; § 185 [manufacturers and throwsters of silk goods]; § 188 [persons engaged in the business of a motion picture film laboratory]; § 186 [jewelers who perform work on watches or jewelry]; § 187 [truckmen and draymen].) Thus, a shoemaker with a lien on a pair of shoes he has repaired or a tailor with a lien on a jacket he has mended will have to seek judicial sanction before satisfying his lien for services performed, even though the debtor has voluntarily relinquished possession of the goods in question and agreed to pay the lienor for the services rendered. In addition, should section 7-210 of the Uniform Commercial Code, the very warehouseman’s lien foreclosure provision recently upheld by the Supreme Court in Flagg Bros. v Brooks (436 US 149, supra) be challenged in State court, stare decisis impels that we declare it unconstitutional. A constitutional attack on section 7-308 of the Uniform Commercial Code, which similarly provides for the foreclosure of a carrier’s lien without a prior judicial hearing, must now likewise be successful. Such results would be particularly distressing where commercial dealings between merchants are involved. Transactions of this nature, essential to the economic vitality of our State, should be free from a judicially inflicted procedural quagmire.
Troublesome, too, is that this court’s ruling, applicable only in this State, will affect the uniformity of commercial lien law as it exists in most of the States.[2] To the extent it may affect the Uniform Commercial Code, it undermines a part of that statute on the basis of a single State’s constitutional vagary in interpretation. Quite a different matter would have been presented if the Supreme Court had accepted, rather than rejected, the novel extension of the State action doctrine.
Due process of law is a constitutional mandate, not an excuse for the imposition of one’s predilections. Rejecting sound analysis, the majority insists on voiding a reasonable statutory framework in the name of due process, when this decision will deal another blow to the economic welfare of the State. I cannot concur in such a result, and vote for reversal of the order of the Appellate Division.
*175 Judges Gabrielli, Wachtler and Fuchsberg concur with Judge Cooke; Judge Jasen dissents and votes to reverse in a separate opinion in which Chief Judge Bréitel and Judge Jones concur.
Order affirmed, etc.

.In Jones v Gordon (76 Civ 1430, US Dist Ct, EDNY, June 21, 1978), the court held that the Flagg decision precludes a finding that sections 200-202 and 204 of the Lien Law involve State action since they are functionally and conceptually identical to section 7-210 of the Uniform Commercial Code, the statute challenged in Flagg.

.It is noteworthy that no decision, including those mentioned in footnote 5 of the majority opinion, which invalidated statutes similar to those at issue here, relied strictly on State, as opposed to Federal, due process grounds. Because all these cases preceded Flagg, their continued viability is questionable.