No. 85-405

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

H. WALTER ROSE and RICHARD H.
ROSE,

          Plaintiffs and Appellants,

   -vs-

LARRY E. MYERS and MICHAEL A.
SCHAFER, Sheriff of Yellowstone
County, Montana

        Defendants and Respondents.

_____

APPEAL FROM:  District Court of the Thirteenth Judicial District,
              In and for the County of Yellowstone,
              The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Robert E. La Fountain argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Harold Hanser, County Attorney, Billings, Montana
        Charles A. Bradley argued, Deputy County Atty.
        Larry Myers, pro se, Billings, Montana

_____

               Submitted:  July 24, 1986

                Decided:  August 21, 1986

Filed:  AUG 21 1986

_____
               Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Appellants, H. Rose and R. Rose, brought an action in the Yellowstone County District Court seeking to declare a sheriff's sale of appellants' horses invalid as held under the agisters' lien statutes, and attempting to nullify the certificate of sale. The District Court found that the sale was valid, that the appellants were not denied their due process by the manner of the notice and sale, and that the remaining horses be returned to appellants upon their posting a $30,000 bond pending resolution of the underlying contract dispute. From this order the Roses appeal.

We affirm the District Court in this case because the appellant had actual notice of the sale.

Appellants raise the following issues on appeal:

1. Whether the sale should have been declared invalid as unconstitutional for failure to provide for notice and an opportunity to be heard prior to deprivation of property?

2. Whether the District Court erred in holding that the notice provisions were complied with in this case?

3. Whether the court erred in failing to declare that the sale was void or voidable?

4. Whether the court erred in using faulty figures in taking judicial notice that the parties' contract price was too low to include feeding, and in applying that decision to justify the court's order?

This dispute arose from an oral contract entered into in April 1984. Myers agreed to care for the Roses' horses at a cost of $12 per head per month. The parties dispute whether Myers was responsible for feeding the horses or merely pasturing them. On November 30, 1984, Myers sent notice to the Roses that an agister's lien sale would take place in

2

December. Money was paid to Myers and the sale was not held. Over the course of the winter, Myers found it necessary to feed the horses at his own expense as the pasture would not support the horses in the winter. Myers contends the agreement was for pasturing only, while the Roses contend it was for the care and feeding of the horses.

On March 1, 1985, Myers again caused to be issued from the Yellowstone County sheriff's office, a notice of an agister's lien sale scheduled for March 11, 1985. The notice was postmarked March 1, 1985, and notices were posted in Yellowstone County. The sale was held March 11, 1985. The Roses contend they did not receive the notice until March 12, 1985. Myers stated he informed the Roses of the sale by telephone on March 2, and 3, 1985.

At the sale, 55 of 129 horses were sold for $6,830 which was then applied by the sheriff to the outstanding bill. The Roses claim the horses' value was far in excess of $6,830, but that none of the horses were sold as registered and most were sold by lots or in gross.

On March 20, 1985, the Roses filed their petition for declaratory relief, and to set aside the sale. Following a hearing before Judge Barz, the District Court held that the sale was valid and the Roses were not denied their due process. The Roses appeal that order.

Appellants' horses were sold pursuant to the agisters' lien statutes, § 71-3-1201, MCA, et seq. Section 71-3-1201, MCA, states:

> (1) If there is an express or implied contract for keeping, feeding, herding, pasturing, or ranching stock, a ranchman, farmer, agister, herder, hotelkeeper, livery, or stablekeeper to whom any horses, mules, cattle, sheep, hogs, or other stock are entrusted has a lien upon such stock for the amount due for keeping, feeding, herding, pasturing, or

3

ranching the stock and may retain possession thereof until the sum due is paid.

Enforcement of the lien is found at § 71-3-1203, MCA. That statute says:

If payment for such work, labor, feed, or services or material furnished is not made within 30 days after the performance or furnishing of the same, the person entitled to a lien under the provisions of this section may enforce said lien in the following manner:

(1) He shall deliver to the sheriff or a constable of the county in which the property is located a statement of the amount of his claim against said property, a description of the property, and the name of the owner thereof or of the person at whose request the work, labor, or services were performed or the materials furnished.

(2) Upon receipt of such statement, the sheriff or constable shall proceed to advertise and sell at public auction so much of the property covered by said lien as will satisfy same.

(3) Such sale shall be advertised, conducted, and held in the same manner as provided by law for the sale of mortgaged personal property by sheriffs. Such notice shall be given for not less than 5 or more than 10 days prior to the date of sale.

(4) The proceeds of the sale shall be applied by the sheriff to the discharge of the lien and the cost of the proceedings in selling the property and enforcing the lien, and the remainder, if any, or such part as is required to discharge the claims, shall be turned over by the sheriff to the holders, in the order of their precedence, of the chattel mortgages or other lien claimants of record against said property, and the balance of the proceeds shall be turned over to the owner of the property.

(5) However, before making seizure of any property under the provisions of this section, the sheriff may require an indemnity bond from the lienor in [sic] not to exceed double the amount of the claim against said property, said bond and the surety or sureties thereon to be approved by said sheriff.

4

Our decision in this case is arrived at on other than constitutional grounds. We find it unnecessary to decide whether § 71-3-1203, MCA, is constitutional and therefore do not consider appellants' first issue.

The attention of the Montana Legislature is respectfully directed to the due process provisions of Article II, Section 17, of the Montana Constitution, the Fourteenth Amendment of the Constitution of the United States and their application to the notice provisions of § 71-3-1203, MCA.

The agisters' lien statute was first enacted in 1895 and is an important part of our commercial law, serving as a practical matter both the interest of debtors and creditors. If in a future case this statute was found to be unconstitutional, it would invite chaos and confusion in this area of law.

Appellants' second issue is whether the District Court erred in holding that the notice requirements were met in this case. Appellants argue that the notices of the sale were untimely and deficient, and that the District Court incorrectly interpreted the statutes in regard to notice.

The Roses claim the notice was untimely as they did not receive notice until one day after the sale. The District Court found that two notices were mailed to the Roses on March 1, 1985, 10 days before the sale. In addition, the Roses received notice in the form of two telephone calls from Myers on March 2, and 3, 1985. The District Court correctly concluded that the Roses received timely notice.

Appellants also claim the notices were deficient in that the notice failed to adequately describe the location of the sale or the property to be sold. The notice stated that the sale was to be held at "10:00 o'clock a.m. 3½ miles SW of Laurel." The notice described the property for sale as "10

5

mix horse colts, 25 mix mares, 17 mix colts, 1 gray stud, 1 sorrel stud, 1 chestnut stud."

The description of the horses is satisfactory. The notice described the horses by number, sex, and color. Appellants' contention that the notice should have described what mix the horses were as well as any special breeding or other special characteristics of the horses is not correct. The notice description was sufficient to alert the public to the nature of the sale and the property to be sold. There is no need for the kind of detailed description advocated by the appellants.

Further, appellants failed to raise the issue of the adequacy of the sale location description during the trial below. Since appellants failed to raise the issue below, we will not address the question on appeal.

The Roses also argue that the District Court incorrectly interpreted the statutes in regard to notice. Section 71-3-1203(3), MCA, states:

> Such sale shall be advertised, conducted, and held in the same manner as provided by law for the sale of mortgaged personal property by sheriffs. Such notice shall be given for not less than 5 or more than 10 days prior to the date of sale.

The District Court concluded that the notice "must be reasonably calculated to reach the owners of the livestock." We agree with the District Court's conclusion that the method of notice was reasonable, and that the Roses received notice of the sale.

Appellants' third issue is whether the District Court erred in failing to declare the sale void or voidable. Both sides agree that for a sale to be valid, the seller, acting in good faith, must substantially comply with the notice requirements of the power of sale, and the resultant sale

6

must be a fair one. As discussed above, the notice require-
ments were substantially complied with in this case. Fur-
ther, we hold that the resultant sale was fair.

The District Court applied the standard of commercial
reasonableness to judge the sale. Appellants argue that the
sale was not commercially reasonable because the horses were
sold in lots for far less than their value. The District
Court answered that:

> The Plaintiffs have not presented any
> evidence that this [sale in lots] is not
> reasonable. Deputy Sheriff Schmaing, on
> the other hand, testified that he has
> conducted thousands of sales and that he
> often sells horses in this manner.
> Further, he testified that he was will-
> ing to sell the horses individually
> should any bidder so request. This
> method was not commercially
> unreasonable.

Although this sale is not governed by the Uniform
Commercial Code, that Code's discussion of commercial reason-
ableness is helpful. Section 30-9-507(2), MCA, states:

> The fact that a better price could have
> been obtained by a sale at a different
> time or in a different method from that
> selected by the secured party is not of
> itself sufficient to establish that the
> sale was not made in a commercially
> reasonable manner. If the secured party
> either sells the collateral in the usual
> manner in any recognized market therefor
> or if he sells at the price current in
> such market at the time of his sale or
> if he has otherwise sold in conformity
> with reasonable commercial practices
> among dealers in the type of property
> sold he has sold in a commercially
> reasonable manner. . .

The above authority supports the District Court's
decision. Although the appellants claim the horses were
worth far more than the selling price, that alone is insuffi-
cient to render the sale unreasonable. Likewise, the fact
that the horses were sold by a method different from that
suggested by appellants (in lots as opposed to individually)

7

does not render the sale unreasonable. The District Court correctly decided that the sale was commercially reasonable, and we will not reverse the District Court's decision.

The final issue raised by appellants is whether the District Court erred in using faulty figures in taking judicial notice that the parties' contract price was too low to include feeding, and in applying that holding to justify the court's order.

In its memorandum in support of its order, the District Court stated:

> Before turning to the law regarding the sale, the Court takes notice of two factors. The Court takes judicial notice that the sum of $12 per head per month cannot possibly include the cost of providing extra feed for the horses. The Court further notes that the Plaintiffs have shown knowledge of this fact by making $7,000 payment to the Defendant prior to March, 1985. (114 head x $12 per month x 8 months = $1,824)
>
> The Court takes note of this, not to rule on the merits of the contract dispute, but rather as a factor in the notice Plaintiffs had regarding the sale.

Appellants argue that the District Court erroneously substituted its judgment for that of the parties who agreed on a contract price knowing the horses were to remain with Myers for an indefinite period of time. The court calculated 114 head x $12 per head x 8 months equals $1,824. Since the Roses paid Myers $7,000 between December, 1984, and February, 1985, the court inferred that the Roses recognized that they owed more than $12 per head per month, and that the excess would be applied to pay for feed over and above the original contract amount. This is wrong.

The correct calculations are: 114 head x $12 per head x 8 months equals $10,944, not $1,824. Thus, appellants argue, the $7,000 payment was a partial payment on the

$10,944, the balance to be paid when the horses were retrieved. The court drew inferences from incorrect figures and erred in applying those inferences to justify its decision.

Further, appellants argue the court took judicial notice of facts not properly subject to judicial notice.

Appellants are correct when they say the court incorrectly calculated the bill and took judicial notice of a fact not appropriate for judicial notice. Rule 201, M.R.Evid. states:

> (b) Kinds of facts. A fact to be judicially noticed must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

However, the error is harmless as there is ample evidence to support the District Court's conclusion. On cross-examination, the appellant Richard Rose, testified as follows:

> Q. Mr. Rose, I believe you stated that the agreement you had with Mr. Myers was that you were to pay him $12.00 per month per horse unit; is that correct? A. That is correct.
>
> Q. Now that was only for pasture; wasn't it? That didn't include feed? A. That is correct.
>
> Q. And if he had to feed them, that would be an additional charge; wouldn't it? A. Yes.
>
> Q. And it doesn't include any labor on his part, either; does it? A. No.

Thus, even without the court's calculations there is ample evidence that the appellants owed Myers more than $10,944 and only paid $7,000. The court took judicial notice that appellants knew they owed Myers for feed and labor costs because they paid Myers in excess of $12 per head per month. The

9

court's calculations were wrong, but the result is the same. Appellants' own testimony revealed that the Roses knew they owed Myers for feed and labor costs in excess of the contract price, so although the court improperly took judicial notice of the fact, the result is supported by the evidence. Therefore, it is not necessary to reverse the District Court on this issue.

The order of the District Court is affirmed in all respects.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____
Justices

Mr. Justice William E. Hunt, Sr., concurring:

I concur in the result reached by the majority, but cannot agree with its analysis of the constitutional challenge raised by appellants.

The majority reaches its decision without addressing appellant's claim that § 71-3-1203, MCA, is unconstitutional as violative of due process. Appellants first raised the issue in their initial complaint before the District Court. They gave notice to this Court of the constitutional challenge in compliance with Rule 38 M.R.App.Civ.P.. Appellants have standing to challenge the statute. I cannot agree with the majority opinion that it is unnecessary to decide whether § 71-3-1203, MCA, is constitutional. The issue is squarely before us and cannot be ignored.

I would hold that § 71-3-1203, MCA, is clearly unconstitutional. The statute violates the due process clauses of the state and federal constitutions. However, I concur in the affirmance of the District Court's decision because the appellants have already had their hearing. Following the sale, the appellants brought an action in the District Court which they litigated to a final judgment, and from which they now appeal. They received the full benefits of a trial in which they had an opportunity to fully present their case. The District Court found in favor of the respondents. Therefore, it is unnecessary to reverse the District Court and remand this case for a hearing.

The agister's lien statute is clearly unconstitutional, however, because there is significant state action involved, and because the statute provides neither notice nor an opportunity to be heard prior to deprivation of property.

11

First, it is clear there is significant state action involved. The Third Circuit Court of Appeals found state action from the mere enactment of a statute authorizing a garageman to sell a customer's vehicle for nonpayment of a bill. Parks v. Mr. Ford (3d Cir. 1977), 566 F.2d 132. The state action under § 71-3-1203, MCA, is far more significant. The sheriff is given a copy of the bill, a description of the property, and the name of the owner. The sheriff then must advertise and conduct the sale, he applies the proceeds of the sale to the debt, and provides the buyer with a bill of sale. Clearly this constitutes significant state action.

Second, the statute does not satisfy the minimum due process requirements elaborated by either the Montana or the United States Supreme Court. As this Court stated in Nygard v. Hillstead and Coyle (1979), 180 Mont. 524, 528-529, 591 P.2d 643, 645:

> It is fundamental that "[n]o person shall be deprived of life, liberty, or property without due process of law." 1972 Mont. Const. Art. II, § 17. "'It is well settled that notice and opportunity to be heard are essential elements of Due Process.'" Halldorson v. Halldorson (1977), 175 Mont. 170, 573 P.2d 169, 171.

The United States Supreme Court has addressed the due process requirement in the area of garnishment, replevin, and sequestration. That line of cases includes Sniadach v. Family Finance Corp. (1983), 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349; Fuentes v. Shevin (1972), 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; Mitchell v. W.T. Grant Co. (1974), 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406, and North Georgia Finishing Co. v. Dichem, Inc. (1975), 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751.

In Sniadach, it was held that the Wisconsin prejudgment garnishment procedure whereby the defendant's wages were

12

frozen in the interim between the garnishment and the culmination of the main suit, without the opportunity for a hearing, violated the Fourteenth Amendment. The Court noted that wages were a specialized type of property and prejudgment garnishment might impose tremendous hardship on wage earners. The Sniadach holding was expanded by Fuentes. In Fuentes, Florida and Pennsylvania statutes were held unconstitutional. Those statutes authorized the issuance of writs ordering state agents to seize a person's possessions upon the ex parte application of any other person who claimed a right to them and posted a security bond, without providing the possessor with notice or an opportunity to be heard. The Court held that a person whose rights are to be affected is entitled to be heard at a meaningful time and in a meaningful manner, and that the replevin statutes in question were constitutionally defective in failing to provide for notice and hearing. The Court noted that "extraordinary situations" may justify the lack of notice and hearing, but such a situation did not exist in that case.

Fuentes was distinguished by Mitchell wherein it was held that a Louisiana statute which permitted the seller of goods under an installment contract to obtain a writ of sequestration to recover the goods, upon buyer's default, and without notice or hearing, did not violate due process. There were other adequate safeguards of due process because the writ would issue only upon a verified affidavit, and upon a judge's authority after the creditor had filed a sufficient bond. The statute entitled the debtor to immediately seek dissolution of the writ unless the creditor proved the grounds upon which the writ issued, and the debtor could regain possession by posting a bond to protect the seller.

The final case is North Georgia Finishing, Inc.. That case relied upon Fuentes to determine that Georgia statutes authorizing garnishment of property other than wages in pending suits, but not providing for notice, hearing, or participation by a judicial officer, violated due process.

The above cases dealt with something less than a sale of the property, i.e., sequestration, replevin, and garnishment. Clearly a permanent deprivation of property, such as occurs in a sale, warrants just as stringent a due process analysis as lesser forms of deprivation. As those cases indicate, due process requires at a minimum both notice and an opportunity to be heard prior to deprivation of property absent extraordinary circumstances, or other sufficient safeguards of due process.

Section 71-3-1203, MCA, does not provide the kind of safeguards which salvaged the Louisiana statute in Mitchell. There is no requirement for a verified affidavit, no participation by a judge, no mandatory bond, and no procedure to seek an immediate halt of the sale. Further, there are no other legal remedies available to sufficiently guarantee due process. The legal procedures available to the owner, such as the institution of an action for conversion or for declaratory relief, are insufficient substitutes for a pre-sale hearing. There is little probability that trial of a contested lien claim can be held within the minimum period preceeding transfer to the buyer, and injunctions or other extraordinary remedies are discretionary with the trial court and thus lack the certainty necessary to insure a hearing prior to permanent deprivation.

The question then becomes whether there exists any extraordinary circumstances which would justify the lack of a

14

hearing prior to the sale. The respondent, Schafer, argues that because the personalty involved was live animals, this constitutes an extraordinary circumstance. This argument is not persuasive. The United States Supreme Court in Fuentes discussed what is meant by "extraordinary situations." As that Court said:

> These situations, however, must be truly unusual . . .. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a governmental official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

Fuentes, 407 U.S. at 90-91.

Thus, the Court has allowed summary seizure to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, or to protect the public from misbranded drugs and contaminated food. The present situation does not qualify as an important governmental interest. It is a private dispute between two parties. State intervention in a private dispute hardly compares to state action furthering a war effort or protecting the public health, and is of insufficient importance to override the due process requirements of notice and hearing. Therefore, I would hold that § 71-3-1203, MCA, is violative of due process as there is no provision for notice and hearing prior to deprivation of property.

The question remains what kind of notice and hearing satisfy due process requirements? The Supreme Court in Fuentes stated that notice must be granted at a meaningful time and in a meaningful manner. Fuentes, 407 U.S. at 80.

15

Further, the Court noted that leeway remains to develop a form of hearing that will minimize unnecessary cost and delay while preserving the fairness and effectiveness of the hearing in preventing seizures of goods where the party seeking the seizure has little probability of succeeding on the merits. Sniadach, 395 U.S. at 343.

The hearing should establish the validity, or at least the probable validity, of the underlying claim before an alleged debtor can be deprived of his property. Consideration should be given to the interests of the parties including the basis of the underlying claim, the nature of the property involved, i.e., its value, uniqueness, etc., and the need for prompt action. The hearing need not be a full blown trial-type hearing, but must protect a property owner's use and possession of property from arbitrary encroachment. This is an especially relevant danger where the State seizes and sells goods merely upon the application of a private party.

Because the appellants have properly challenged the constitutionality of § 71-3-1203, MCA, the issue must be addressed. However, I concur in the result reached by the majority and would affirm the District Court in all respects.

I concur.

_____
Justice

16